UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

JOHNY L. BARKER,

          Plaintiff,

v.                                    Civil Action No. 2:20-cv-00357

ANTHONY L. GAYLOR, individually, and
in his official capacity as a police
officer for the City of Charleston;
TROY VANHORN, individually, and in
his official capacity as a police
officer for the City of Charleston;
SHAUN MCCLURE, individually, and in
his official capacity as a police
officer for the City of Charleston; and
CITY OF CHARLESTON, d/b/a Charleston
Police Department, a municipal corporation,

          Defendants.

MEMORANDUM OPINION AND ORDER

          Pending is defendants' motion for summary judgment,

filed on May 14, 2021.  ECF No. 47.  Plaintiff filed a response

on June 2, 2021, to which defendants replied on June 9, 2021.

ECF Nos. 52, 55.

I. Background

          This case involves the deployment of a police canine,

K-9 Berkley, by Corporal Anthony L. Gaylor on May 22, 2019,

resulting in substantial injuries to plaintiff Johnny L. Barker.

On the morning of May 22, 2019, at approximately 8:00 AM, the Charleston Police Department ("CPD") responded to a trespassing complaint at 1520 Huron Terrace in Charleston called in by the property owner, who encountered unknown male occupants after entering the house.  Gaylor Dep. 49-50, ECF No. 52-5; McClure Dep. 53, ECF No. 52-6; Vanhorn Dep. 38, ECF No. 52-7. The property was a two-story, dilapidated house with the windows boarded and debris on the front porch.  McClure Bodycam at 3, ECF No. 52-3.

At the time, the house was being occupied by plaintiff, Carol Jarvis, her son, Dylan Jarvis, and a male companion of hers, whose name is unknown.  Barker Dep. at 5-6. None had permission to be on the premises.  Id.  Plaintiff, who was also in the house, understood that, though the property was abandoned, he and the other three did not have a right to be on the property.  Id. at 13. Dylan Jarvis left before the police arrived.  Id. at 7.  The remaining three hid on the second floor of the house when the police arrived.  Id.

Corporal Shaun McClure, a Charleston Police officer, and Officer Christian Harshbarger, a patrolman, were the first to arrive at the house around 8:00 AM.  Compl. and Answer at ¶ 16.  After a discussion with the homeowner, the officers received permission to kick in the door, which they did.

2

McClure Bodycam at 3-4.  While standing in the entryway of the house, Harshbarger and McClure proceeded to give several repeated commands in rapid succession for the occupants to announce themselves, surrender themselves, and come downstairs. Id. at 4-5.  None of the occupants responded.  Id.  Harshbarger indicated that he saw people walking on the second floor of the home through gaps in the first-floor ceiling and shouted to the occupants that he could see them.  Id.

Plaintiff hid by crawling from a second-floor room into a cramped and dilapidated crawlspace above the front porch of the house behind some cabinets.  Barker Dep. 7-8.  The space was about three to four feet tall and without full flooring. Id. at 10-11.  Plaintiff crawled over the rafters to get to his hiding spot so that he would not fall through the floor.  Id. According to plaintiff, Jarvis' male companion had likewise crawled into that same space prior to plaintiff getting there, forcing plaintiff to position himself in front of the other occupant with his leg sticking out from behind the cabinet.  Id. at 8.

Sergeant Troy Vanhorn, a CPD officer, arrived on the scene at approximately 8:09 AM.  Compl. and Answer at ¶ 17.  At about 8:12 AM, Harshbarger gave another warning that "[w]e're gonna send the dog in to bite you!"  Harshbarger Bodycam at 13-

14, ECF No. 52-2.  Corporal Gaylor, a canine handler, arrived with K-9 Berkley at the scene at approximately 8:17 AM.  Compl. and Answer at ¶ 18.  Gaylor asked if the officers had warned about the possible use of a police canine and Harshbarger confirmed that he had.  Harshbarger Bodycam at 17-18.

The officers gave another series of warnings to the occupants as they entered the house, with Gaylor shouting "Charleston Police canine! Come down or I'll send the dog in and you're going to get bit!" and "I'm going to send the dog up there! You'd better get the f—k down here now!"  McClure Bodycam at 19-20.  McClure added "She has titanium teeth.  Crunch, crunch," and shouted "Come on down unless you want bit."  Id. Gaylor noted that he heard people moving upstairs.  Id.  The female occupant came downstairs and was arrested by the officers.  Id. at 20-21.  The woman denied that there were others in the house but McClure noted that he had seen somebody wearing blue jeans and that the property owner had seen a male occupant.  Id.  Gaylor again shouted "Charleston Police! If you do not come down, I will send up the dog, and you're gonna get bit."  Id.

Believing that at least one other individual was in the house, McClure and Vanhorn discussed the use of K-9 Berkley, a police canine with reinforced titanium teeth, outside of the

4

house.  McClure Bodycam at 22-24; ECF No. 52-16 (pictures of K-9 Berkley's teeth).  McClure noted that while they were responding to a simple trespass, he thought the dynamic had changed given there were definitely individuals hiding in the house.  Vanhorn then stated "I'm not sure about the K-9 use" at 8:22 AM.  Id. During his deposition, Vanhorn acknowledged that one of the reasons for this concern with respect to deploying the canine was that the offense involved was trespassing, a low-level misdemeanor.  Vanhorn Dep. at 40.  The officers decided to attempt to clear the house themselves without use of the K-9. McClure Bodycam at 24-25.

At 8:24 AM, Gaylor, Vanhorn, and McClure searched the upstairs of the home personally, loudly kicking in doors and sweeping the various upstairs rooms and closets, which were in a severely deteriorated condition and covered in debris.  McClure Bodycam at 25-27.  After searching the second floor of the home, Gaylor located plaintiff within the cramped crawlspace above the front porch.  Gaylor Bodycam at 5-7, ECF No. 52-1.  Gaylor at first attempted to crawl through the space for about a minute. Id. at 8-9.  When he saw Barker's leg sticking out from behind the cabinet, he demanded that plaintiff come out, shouting "Let me tell you something right now, motherf—r. You'd better get your f—king hands where I can see them. And I mean f—king RIGHT

NOW!  I'm not gonna tell you again before I go get the f—king dog. I'm looking right at you behind those f—king cabinet drawers."  Id. at 8-10.  Plaintiff did not move or respond to Gaylor's commands.  Id. at 9-10.  After about 20 seconds passed, Gaylor stated "Hey, listen! I'm going for the dog," as he made his way out of the crawlspace.  Id.

Gaylor then went down to the police cruiser and retrieved K-9 Berkley.  Id. at 10-11; Gaylor Dep. 54.  On his way out, Gaylor told McClure and Vanhorn that he was getting K-9 Berkley to which McClure responded "go get it" and Vanhorn responded "alright."  Id.  While Gaylor was retrieving K-9 Berkley, plaintiff received another series of warnings and commands from Vanhorn and McClure.  Vanhorn shouted to plaintiff, "Charleston Police! We're getting the dog. You better come out. Charleston Police!"  McClure Bodycam at 29 -30.  About one minute later, McClure told plaintiff, "I promise you, you are not going to like getting bit by the dog. You best come out now."  McClure Bodycam at 30-31.  A few seconds later, one of the officers commanded "come out before the dog comes in!" and a few seconds after that, Vanhorn told Barker "This is your warning. He's bringing the dog in if you don't come out."  Id.  At 8:30 AM, McClure suggested accessing plaintiff by breaking a

hole into the drywall separating the officers from plaintiff.
Id.

        Gaylor returned upstairs at approximately 8:31 AM.
Gaylor Bodycam at 11-12.  Gaylor shouted that he was "[c]oming
up!" with the K-9, and one of the upstairs officers repeated
this, stating, "Coming with the dog!"  Id.  Gaylor confirmed
with the other officers that plaintiff continued to not comply
with commands and one of the officers shouted "The dog is here!"
Id.

        About 10 seconds later, Gaylor began crawling into the
crawlspace with K-9 Berkley.  Id.  Gaylor maintained a fairly
long lead on K-9 Berkley's leash, which he estimated at about 15
feet and which he began to loosen as K-9 Berkley approached
plaintiff.  Gaylor Dep. 101-02.  Gaylor shouted to plaintiff
that "[t]his is your last warning."  Gaylor Bodycam at 11:45.
Within about one second of Gaylor giving plaintiff his last
warning, plaintiff yelled something, which plaintiff contends
was "I'm coming out."[1]  Gaylor Bodycam at 11:48.  Plaintiff's
announcement came too late and Gaylor released the leash

_____

1 Defendants appear to contest that plaintiff said "I'm coming
out."  The court cannot discern from the video whether plaintiff
did in fact state that he is coming out, though defendants have
not presented evidence that plaintiff did not state he was
coming out.

resulting immediately in plaintiff's screams of pain as K-9
Berkley bit plaintiff's right leg.  McClure Bodycam at 31-32;
Barker Dep. at 19, 81.

K-9 Berkley continued to bite/chew on plaintiff's leg
for about one to two minutes, until McClure handcuffed plaintiff
through a small hole in the wall between the room and the
crawlspace.  Gaylor Bodycam at 12-13; McClure Bodycam at 32-33;
Gaylor Dep. 62.  Gaylor commanded K-9 Berkley to release its
bite from plaintiff's leg but it did not obey the command.
Gaylor Dep. 62.  Gaylor had to crawl further into the crawlspace
and use his flashlight to pry K-9 Berkley's jaws off of
plaintiff's leg.  Gaylor Dep. 61-62; Barker Dep. 83.  K-9
Berkley was finally pried from plaintiff's leg within about one
to two minutes.  Id.  One of the officers warned Gaylor over the
radio that the crawlspace was about to fall through.  Gaylor
Bodycam at 14-15.

At 8:36 AM, plaintiff crawled out of the attic
compartment while handcuffed.  McClure Bodycam at 35-37.
Plaintiff was wailing in pain and one of the officers observed
that plaintiff had lost control of his bowels.  Id.; Answer at ¶
36; Gaylor Dep. 120.  McClure led plaintiff from the second
floor down two flights of steps to the sidewalk outside.
McClure Bodycam 37-39.  Plaintiff was able to walk out with

apparent difficulty and pain.  Id.  He was charged with
obstructing an officer and trespass in a structure or
conveyance.  ECF No. 52-20 (Criminal Complaints and Dismissal
Orders).  Both charges were dismissed.[2]  Id.

Plaintiff was treated by EMS and transported by
ambulance to Charleston Area Medical Center ("CAMC").  ECF No.
53-2 (plaintiff's medical records).  The EMS recorded the size
of the wound to be about that of a baseball on the rear of his
right leg.  Id.  He described his pain level as a 10 out of 10.
Id.  The treating physician at CAMC described "extensive deep
tissue lacerations to [plaintiff's] right ankle," "complex open
wounds," and "significant soft tissue injury."  Id. at 9, 14-15.
Plaintiff remained at CAMC for 20 days before being discharged
on June 11, 2019.  Id.  While at CAMC, plaintiff required
several debridements – the removal of damaged tissue of a wound
- and the wound became infected with MRSA.  Id.  Plaintiff also
underwent an unsuccessful "free flap reconstruction."  Id.

Following discharge from CAMC, plaintiff needed to
reside with his parents in Harrison County, WV, given his
ongoing care needs.  Barker Dep. 47.  For a period of time

---

2 It is not clear whether Gaylor or any of the other officers
knew that the individual identified by plaintiff as the male
companion of Carol Jarvis was in the crawl space occupied  by
plaintiff, if in fact he was.

plaintiff received at-home nursing care from a home health care group, including vacuum-assisted closure of the wound and re-wrapping of bandages.  Id. at 55-56.  Plaintiff continued to live with his parents at least through the time of his deposition on March 8, 2021.  Id. at 57-58.

After being examined by a plastic surgeon at CAMC on July 24, 2019, plaintiff was deemed ready for a skin graft procedure.  ECF No. 53-2 at 25.  Plaintiff was unable to return to undergo the plastic surgery due to plaintiff's inability to obtain transportation.  Barker Dep. 48-49.  Plaintiff has alleged a cost of medical care and treatment resulting from the canine attack in excess of $275,000.  ECF No. 53-1 (Rule 1006 summary of medical expenses).  Plaintiff reports continued pain, discomfort, numbness, and swelling in his right leg, as well as permanent scarring.  Barker Dep. 78; ECF No. 52-15 (photograph of plaintiff's leg).

Plaintiff alleges six counts in his complaint, filed May 22, 2019: Excessive Use of Force by Officer Gaylor in violation of 42 U.S.C. § 1983 (Count I)[3]; Excessive Use of Force by Officers Vanhorn and McClure, Bystander Liability arising

---

3 Plaintiff numbered Count I of the complaint with a Roman numeral and the remaining counts with Arabic numerals.  For the purpose of consistency, the court hereinafter refers to all counts with Roman numerals.

under 42 U.S.C. § 1983 (Count II); Excessive Use of Force by Officer Vanhorn, Supervisor Liability under 42 U.S.C. § 1983 (Count III); Municipal Liability under 42 U.S.C. § 1983 by the City of Charleston ("the City") (Count IV); Assault and/or Battery by Officer Gaylor (Count V); and Intentional Infliction of Emotional Distress by Officers Gaylor, McClure, and Vanhorn (Count VI).  ECF No. 1.

## II. Standard of Review

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Material" facts are those necessary to establish the elements of a party's cause of action.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010).  A "genuine" dispute of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-moving party.  Anderson, 477 U.S. at 248.

Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  United States v. Diebold, Inc., 369 U.S.

654, 655 (1962).  A party is entitled to summary judgment if the record, as a whole, could not lead a rational trier of fact to find for the non-moving party.  Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).  Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party.  Anderson, 477 U.S. at 248.

### III. Discussion

A. Excessive Use of Force

"The Fourth Amendment prohibits police officers from 'using excessive force to seize a free citizen.'"  Hupp v. Cook, 931 F.3d 307, 321 (4th Cir. 2019) (citing Jones v. Buchanan, 325 F.3d 520, 527 (4th Cir. 2003) and Graham v. Connor, 490 U.S. 386, 395 (1998)).  "Rather, police officers are constitutionally permitted to use only that force which is reasonable under the circumstances."  Id.; see also Betton v. Belue, 942 F.3d 184, 191 (4th Cir. 2019).  The standard of review for allegations of unreasonable force under the Fourth Amendment is "an objective one," and "the question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force."  Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996).

12

The Fourth Circuit has cautioned that "a reviewing
court may not employ 'the 20/20 vision of hindsight' and must
make 'allowance for the fact that police officers are often
forced to make split-second judgments – in circumstances that
are tense, uncertain, and rapidly evolving.'"  Id. at 642.  "The
court's focus should be . . . on the fact that officers on the
beat are not often afforded the luxury of armchair reflection."
Id.

The court must pay "careful attention to the facts and
circumstances of each particular case, including the severity of
the crime at issue, whether the suspect poses an immediate
threat to the safety of the officers or others, and whether he
is actively resisting arrest or attempting to evade arrest by
flight."  Graham v. Connor, 490 U.S. 386, 396 (1989).  The
Fourth Circuit has also instructed consideration of the extent
of the plaintiff's injuries.  Rowland v. Perry, 41 F.3d 167, 174
(4th Cir. 1994).  The court takes each factor in turn.

1. Severity of the Crime

At the time of the incident, plaintiff was engaged in
a trespass, a minor and likely non-violent offense.  Defendants
characterize plaintiff as engaged in a burglary, a crime which
plaintiff was never charged with, and argue that burglary is a
serious and potentially violent felony.  Under West Virginia

13

law, a burglary requires breaking and entering, or entering
without breaking, of a dwelling house, or outbuilding adjoining
a dwelling.  W. VA. CODE § 61-3-11(a).  A dwelling house
"includes, but is not limited to, a mobile home, house trailer,
modular home, factory-built home, or self-propelled motor home,
used as a dwelling regularly or only from time to time, or any
other nonmotorized vehicle primarily designed for human
habitation and occupancy and used as a dwelling regularly or
only from time to time."  See W. VA. CODE § 61-3-11(b).  A
structure ceases to be a "dwelling house" for purposes of § 61-
3-11 when its occupants leave without any intention of
returning.  State v. Scarberry, 418 S.E.2d 361, 364 (1992).
Moreover, a building must be "suitable for residential purposes"
to be considered a dwelling.  Id.

        Drawing inferences in the light most favorable to the
plaintiff as the non-movant, the responding officers could not
have reasonably concluded that they were responding to a
burglary call, as opposed to a simple trespass.  Harshburger and
McClure had been dispatched for a reported trespass and
plaintiff was only charged with trespass and resisting an
officer.  Incident Report, ECF No. 52-18.  Despite the fact that
plaintiff and others were in fact occupying the building in the
days before the incident, there is no evidence that the

14

responding officers knew that they had been present for any length of time prior to the morning of May 22.  Moreover, the appearance of the home was consistent with it having been abandoned and unsuitable for residential purposes, given its extremely dilapidated condition, boarded windows and doors, and the refuse strewn throughout the house.  Accordingly, for purposes of summary judgment, plaintiff was at most engaged in the relatively minor and nonviolent crimes of trespass and obstructing an officer at the time of K-9 Berkley's deployment.

### 2. Immediate Threat to Officers

Taken in the light most favorable to plaintiff, the defendants had little reason to believe that plaintiff posed an immediate threat to them or was armed, though he could have been both.  When K-9 Berkley was deployed against plaintiff, he was cornered inside of a crawlspace with no path of escape, while at least four police officers were present at the scene.  At the same time, the officers also did not affirmatively know that plaintiff was not in fact armed or dangerous.

While Gaylor testified in his deposition that there was ammunition present in the house, there was no evidence existing prior to litigation that the officers were aware of or considered the presence of ammunition or the presence of a weapon during the incident.  None of the officers verbalized the

fact that there was ammunition present at the scene or a concern
about plaintiff being armed.  Ammunition was not mentioned in
their post-incident reports and ammunition was not taken into
custody.  Plaintiff's use of force expert, Dennis Root, reports
that it would have been a serious tactical error and officer
safety violation to not alert fellow officers to the presence of
ammunition at that time had any of the officers noticed it.
Root Report, ECF No. 52-10.  Thus, whether the presence of
ammunition factored into the use of force decision is a disputed
material fact.

        The officers also observed objects which did not
"fit[] into what is supposedly an abandoned house" and which
suggested a theft may have been taking place.  Gaylor Dep. 98-
99.  This included such innocuous items as baseball cards and a
cell phone.  These items, of course, do not in themselves
suggest an immediate threat to the officers or the presence of a
weapon.

        Finally, defendants observe that there was concern
that the crawlspace itself was dangerous, inasmuch as it was
dark, tight, and showed signs of potential collapse.  Moreover,
they note that there were dirty needles present in the home.
These environmental conditions may have posed a danger to the
officers should they have undertaken to crawl through the space,

16

though it should be noted that these conditions did not pose an immediate threat, such that defendants were forced to make split-second decisions regarding the use of force.  Rather, as the videos make clear, they had several minutes to make decisions regarding the method of extracting plaintiff from the crawlspace.

### 3. Passivity of Resistance

At the time that force was deployed on plaintiff, he was cornered inside the crawlspace, not moving or speaking at all until he uttered something about one second before the canine was deployed.  Gaylor testified that he did not know at the time whether plaintiff was even conscious or awake.  Gaylor Dep. 54.  While defendants seek to characterize this as "active fleeing" inasmuch as plaintiff went through the hole in the wall, crawled through the crawl space, and says he pushed Jarvis' male companion further into his hiding place, none of plaintiff's movement occurred while the officers were present and the extent of plaintiff's flight was not known by the officers at the time force was deployed.  Rather, from the time the officers located plaintiff until the deployment of K-9 Berkley, there is no evidence that plaintiff exhibited any resistance to the officers beyond ignoring their commands to surrender himself.

### 4. Severity of Injuries

Plaintiff sustained substantial injury to his leg as a result of the deployment of K-9 Berkley. First, it bears mentioning that K-9 Berkley had titanium crowns installed on his teeth in November 2018. Gaylor Dep. 43. Moreover, a police dog's bite can impose between 1,200 and 2,000 pounds of force per square inch. <u>Vathekan v. Prince George's County</u>, 154 F.3d 173, 177 n. 3 (4th Cir. 1998). The video evidence evinces that plaintiff was in extreme pain following K-9 Berkley's attack and plaintiff was immediately rushed to the hospital in an ambulance.

As a result of the incident, plaintiff spent twenty days in the hospital, undergoing multiple procedures, and requiring post-discharge attention from home nurses and aid from family members. Further, plaintiff testified to ongoing medical issues resulting from the injury, including scarring, pain, discomfort, numbness, and swelling.

In sum, the court does not conclude as a matter of law that the deployment of K-9 Berkley was objectively reasonable under the Fourth Amendment. While plaintiff's dangerous hiding place posed unique risks to the officers, the relatively minor and nonviolent nature of the crime of trespass, the lack of a known immediate threat to the officers, plaintiff's passive

18

resistance, and the severity of his injuries weigh against finding that deploying K-9 Berkley was objectively reasonable.

B. Qualified Immunity

Government officials are shielded "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity provides police officers with "'ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" Hunter v. Bryant, 502 U.S. 224, 229 (1991) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). Officers "are not liable for bad guesses in gray areas," but "they are liable for transgressing bright lines." Maciarello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992).

For a right to be "clearly established," it is not necessary that "the very act in question have been previously held unlawful," but "in the light of pre-existing law the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640 (1987). "[I]f the contours of the right are sufficiently clear so that a reasonable officer would have understood, under the circumstances at hand, that his behavior violated the right" there is no entitlement to qualified

immunity.  Bailey v. Kennedy, 349 F.3d 731, 741 (4th Cir. 2003)
(citing Wilson v. Layne, 526 U.S. 603, 615 (1999)).

     Still, the Supreme Court has recently cautioned
against defining the right in question at too high a level of
abstraction, particularly in excessive use of force cases.  City
of Escondido, Cal. v. Emmons, 139 S. Ct. 500, 503 (2019).  This
is because it can be particularly difficult for an officer to
determine how the Fourth Amendment will apply to a given factual
situation.  Id.  Given the fact-specific nature of the use of
force inquiry, "police officers are entitled to qualified
immunity unless existing precedent squarely governs the specific
facts at issue." Id. (quoting Kisela v. Hughes, 138 S.Ct. 1148,
1153 (2018).

     Stated at the appropriate level of particularity, the
right allegedly violated by Officer Gaylor is that of a
passively resistant misdemeanant to be free from attack by a
police dog, or an equivalent level of force, where that
misdemeanant was (1) hiding in a location where the conditions
of that location posed substantial danger to an officer in
retrieving that individual, (2) where the officers did not know
whether the individual was armed or unarmed, and (3) following
many unheeded warnings (15 times in 20 minutes) that a police
canine would be utilized and that the canine would bite the

misdemeanant.  Each of these facts is critical to the
reasonability of the use of force and bears on whether
plaintiff's rights were violated.

          No binding precedent in this circuit has held that the
use of police dogs in similar circumstances constituted the
unreasonable use of force.  Plaintiff relies on two Fourth
Circuit decisions, Kopf v. Wing, 942 F.2d 265 (4th Cir. 1991)
and Vathekan v. Prince George's County, 154 F.3d 173 (4th Cir.
1998).  Both cases involved the release of a police dog either
without a warning or where there was a factual dispute as to
whether a warning was given.  Kopf, 942 F.2d at 268 (factual
dispute as to whether warning was given "is crucial, because a
forewarning that the dog is going to attack, which provides the
suspects a fair chance to surrender, is more reasonable than a
surprise assault"); Vathekan, 154 F.3d at 179 ("Vathekan's claim
is based on her Fourth Amendment right to be free from excessive
force in the course of a Fourth Amendment seizure brought about
by a police dog that was deployed without a verbal warning").
In contrast, plaintiff admitted that when the officers were
upstairs, he could hear what they were saying, including their
warnings.  Barker Dep. 16.  The video of the incident reveals
several instances of the officers shouting to plaintiff, while
they were upstairs and within a few feet of plaintiff, that they

were getting the dog and that the dog would bite him.  The two Fourth Circuit cases demonstrate that whether a victim is given such a warning is crucial to the use of force inquiry.  Kopf, 942 F.2d at 268; Vathekan, 154 F.3d at 179.  Here, the plaintiff was repeatedly warned.

Plaintiff also relies on two out-of-circuit cases, one a circuit opinion and the other a district court decision, in an effort to demonstrate that his right was clearly established at the time of the incident.  But see Edwards v. Goldsboro, 178 F.3d 231, 251 (4th Cir. 1999) ("If a right is recognized in some other circuit, but not in this one, an official will ordinarily retain the immunity defense").

In Cooper v. Brown, the Fifth Circuit affirmed the denial of summary judgment where a police canine continued to bite a suspect not resisting arrest for one to two minutes.  844 F.3d 517, 521 (5th Cir. 2016).  The suspect in that case had fled on foot after being pulled over under suspicion of driving under the influence of alcohol and hid inside a small wood-fenced area used to store trash bins between two houses.  Id. The K-9 unit found the suspect and bit him for one to two minutes, while the suspect made no further attempt to flee or to strike the K-9.  Id.  The officer could see the suspect's hands and "appreciate[d] that he had no weapon."  Id.   Cooper bears

22

little similarity to plaintiff's case and cannot be said to put
the question of excessiveness of the use of force in this case
beyond question.  Crucially, the officer in that case did not
face a comparable danger to that posed by crawling through a
narrow space without a proper floor in a dilapidated house to
extract a hidden suspect who may or may not be armed.  Rather,
the officer in Cooper was on solid ground in a residential
neighborhood and knew that the suspect was unarmed.
Additionally, it does not appear that the suspect in Cooper
received any warning prior to the deployment of the police
canine.  Id.

A more recent, and more analogous, Fifth Circuit case
makes plaintiff's point more doubtful.  In Schumpert v. City of
Tupelo, an officer was surveilling a location for suspected drug
activities.  905 F.3d 310, 315 (5th Cir. 2018).  When he pulled
over a vehicle he suspected to be involved in such activities
for a failure to use a turn signal and driving without a working
taillight, the driver, Schumpert, stopped the vehicle and ran
from the car into a nearby neighborhood.  Id.  Another officer
arrived with a K-9 and found Schumpert hiding in a crawl space
under a house.  Id.  The officer commanded that Schumpert show
his hands and come out or a dog would bite him.  Id.  After the
warning, Schumpert continued further into the crawlspace and the

officer released the dog who bit Schumpert.  Id.  In finding for the defendant officer on qualified immunity grounds, the Fifth Circuit distinguished Schumpert from Cooper, inasmuch as the officer did not know whether the suspect was armed or dangerous and the suspect's continued resistance to arrest despite the warning prior to the dog being released.  Id. at 322.

The second out-of-circuit case plaintiff cites, a district court case, held that an officer acted objectively unreasonably when ordering a police dog to pursue an individual fleeing on foot after being pulled over for having an improper license plate.  Marley v. City of Allentown, 774 F. Supp. 343 (E.D. Pa. 1991), aff'd mem., 961 F.2d 1567 (3d Cir. 1992).  As with Cooper, the facts of Marley are too dissimilar in material ways to those the officers confronted in this case to properly put the officers on notice here that the use of force was unreasonable.  Moreover, an out-of-circuit district court case, on its own, would not ordinarily place an officer on notice as to a right for purposes of qualified immunity.  See Matusick v. Erie Co. Water Authority, 757 F.3d 31, 61 (2d Cir. 2014).

Still, "the nonexistence of a case holding the defendant's identical conduct to be unlawful does not prevent the denial of qualified immunity."  Edwards, 178 F.3d at 251.  Where the violation is "obvious," there need not be a factually

24

analogous case in order for the right to be clearly established. See, e.g., Brosseau v. Haugen, 543 U.S. 194, 199 (2004).  Given the danger posed to the officers by the condition of the crawlspace and the house in general, the fact that officers could not determine whether plaintiff was armed, and plaintiff's continued silence and noncompliance with the officers' commands and over a dozen warnings that the canine would be dispatched to bite plaintiff, this is not such an obvious case that the officers were effectively put on notice that their actions exceeded the bounds of the Fourth Amendment.  The lack of an analogous case establishing plaintiff's relevant right entitles defendants to qualified immunity.

Finally, plaintiff's reference to the officers' general subjective awareness of CPD's policies against the use of unreasonable or excessive force and of the Graham v. Connor factors is not determinative of the qualified immunity issue. The key issue is whether plaintiff's right was clearly established law at the time.  Application of the Graham v. Connor factors in determining the reasonability of use of force is highly fact specific.  See supra p. 13.  The case law simply does not show that plaintiff's clearly established rights under the Fourth Amendment were violated in this circumstance. Accordingly, Count I of the complaint is dismissed.

Plaintiff's claims for bystander liability against Vanhorn and McClure (Count II) and for supervisor liability against Vanhorn (Count III) are both derivative of his claim that Gaylor violated his rights by deploying K-9 Berkley. Because no clearly established right was violated, Vanhorn and McClure are entitled to qualified immunity for the derivative claims as well.

C. __Monell__ Liability

Local governmental bodies may be liable under § 1983 based on the unconstitutional actions of individual defendants where those defendants were executing an official policy or custom of the local government that resulted in a violation of the plaintiff's rights. __Monell v. Dep't of Soc. Servs.__, 436 U.S. 658, 690-91 (1978). The __Monell__ Court explained that "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury the government as an entity is responsible under § 1983." __Id.__ at 694. However, liability attaches "only where the municipality itself causes the constitutional violation at issue." __City of Canton v. Harris__, 489 U.S. 378, 385 (1989); __accord__ __Holloman v. Markowski__, 661 F. App'x 797, 799 (4th Cir. 2016) (per curiam), __cert. denied__, 137 S. Ct. 1342 (2017).

To present a claim for municipal liability, a
plaintiff must show (1) the officers acted pursuant to a policy
or custom and (2) the policy or custom caused a violation of the
plaintiff's constitutional rights. See, e.g., Kirby v. City of
Elizabeth City, 388 F.3d 440, 451 (4th Cir. 2004), cert. denied,
547 U.S. 1187 (2006). A plaintiff may demonstrate the existence
of an official policy in three ways: (1) a written ordinance or
regulation; (2) certain affirmative decisions of policymaking
officials; or (3) in certain omissions made by policymaking
officials that "manifest deliberate indifference to the rights
of citizens." Carter v. Morris, 164 F.3d 215, 218 (4th Cir.
1999). "Locating a 'policy' ensures that a municipality is held
liable only for those deprivations resulting from the decisions
of its duly constituted legislative body or of those officials
whose acts may fairly be said to be those of the municipality."
Bd. of Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 403-04
(1997).

To establish a Monell claim, the plaintiff "must point
to a persistent and widespread practice[ ] of municipal
officials, the duration and frequency of which indicate that
policymakers (1) had actual or constructive knowledge of the
conduct, and (2) failed to correct it due to their deliberate
indifference." Owens v. Baltimore City State's Attorney's

Office, 767 F.3d 379, 402 (4th Cir. 2014) (quotation marks omitted), cert. denied, 575 U.S. 983 (2015). "Sporadic or isolated violations of rights will not give rise to Monell liability; only 'widespread or flagrant' violations will." Id. at 403.

Plaintiff points to two theories of Monell liability: (1) the Charleston Police Department's failure to train officers in use of force topics after their time of hiring and (2) a custom of allowing officers to disregard a prohibition on the use of canines against unarmed and undangerous misdemeanor suspects contained in CPD's Policy and Procedures Manual.

Plaintiff relies heavily on the opinion of Dennis Root, its use of force expert, to demonstrate that the lack of follow-up training demonstrates deliberate indifference and resulted in plaintiff's injuries. Specifically, Root opines in his report that officers did not receive adequate training in "the use of force, the force decision-making process, interpersonal communications, de-escalation techniques, and policies and procedures." Root Report at 39. Root concedes that the CPD "appears to require all of its personnel to attend some of these courses when they are first employed." Id. at 38. He notes, for example, that Gaylor, McClure, and VanHorn all received training regarding the policies and procedures of CPD

regarding use of force, though "the training documentation
showed none of these topics had been taught or revisited at any
time since the initial instruction." Id. Root also concedes
that CPD delivers annual trainings to officers but that he had
not received the lesson plans and thus could not determine with
specificity the content of the courses delivered by CPD. Id. at
37.

        Assuming that the lack of follow-up training on the
topics Root identified amounted to deficient training on the
part of CPD, there is no evidence in the record that it arose
out of a deliberate indifference. While Root refers to the lack
of follow-up training as "'deliberate' or 'conscious,'" he
provides no evidence or analysis as to how the City was put on
notice, actual or constructive, of the need to provide further
training. The only reference to a past incident which might
have given notice to CPD as to a need for further training was
the January 3, 2018 deployment of K-9 Berkley by Captain Gaylor
on an individual suspected of breaking and entering into an
automobile. See ECF No. 52-24 (Investigative Report). However,
the investigation of that case found that the deployment of K-9
Berkley on that suspect conformed to department policy, given
the suspect had a history of fleeing police, was known to carry
burglary tools that could be used as weapons, and the fact that

Gaylor was the only officer responding to the scene.  <u>Id.</u>
Nothing in the report of that investigation evidences that the
use of force there could have been avoided had Gaylor or anyone
else received additional training.  Root does not attempt to
show why this single incident did or should have alerted CPD to
a need to provide additional training to officers, nor does any
other evidence in the record suggest as much.

        Further, plaintiff lacks evidence demonstrating a
causal connection between the supposed failure to train and the
violation of his rights.  As the Supreme Court has noted,

> That a particular officer may be unsatisfactorily
> trained will not alone suffice to fasten liability on
> the city, for the officer's shortcomings may have
> resulted from factors other than a faulty training
> program . . . Neither will it suffice to prove that an
> injury or accident could have been avoided if an
> officer had had better or more training, sufficient to
> equip him to avoid the particular injury-causing
> conduct.  Such a claim could be made about almost any
> encounter resulting in injury, yet not condemn the
> adequacy of the program to enable officers to respond
> properly to the usual and recurring situations with
> which they must deal.  And plainly, adequately trained
> officers occasionally make mistakes; the fact that
> they do says little about the training program or the
> legal basis for holding the city liable.

<u>Harris</u>, 489 U.S. at 385.  The case for a causal connection is
particularly weak where, as here, the officers each received the
kind of training that plaintiff's expert suggests that they
should have received, though not as recently as he opines they
should have.  Moreover, Root provides no details as to what the

content of such retraining might look like, or how frequently it should be required, so that a factfinder could determine whether such trainings would have avoided any potential deprivation of plaintiff's rights in this case.

Additionally, the evidence does not show whether the involved officers had received the training that Root opines would have avoided this incident more recently than their initial training.  While Root indicated that "[b]ased on the training documentation I have received and reviewed, the Charleston, West Virginia, Police Department did not provide its personnel with the necessary force related training," he also stated that without the lesson plans, which he did not have, he could not determine the content of the courses taught.  The only training history report in the record, that of McClure, shows that he attended an eight-hour course on May 14, 2019, eight days before the incident in this case, that purported to "instill confidence in police officers to professionally handle encounters with confrontational, non-compliant individuals without violating their Fourth Amendment rights."  ECF No. 52-17.  While both Vanhorn and Gaylor indicated in their depositions that they could not recall whether they had received de-escalation training after their initial training with CPD, they did not testify that they did not receive such training.

Accordingly, there is no basis to conclude that a policy of not providing follow-up training on use of force at CPD caused plaintiff's rights to be deprived.

Root also opines that the CPD has a pattern or practice of allowing officers to violate the written use of force and canine policies.  The written policy in question, contained in the Policy and Procedures Manual, indicates that a canine should not be deployed on a misdemeanor suspect unless that individual is armed and dangerous or believed to be armed and dangerous.  CPD contends that it has discontinued this policy in favor of one that evaluates canine use based on the totality of the circumstances, rather than a simple felony / misdemeanor dichotomy, without updating the Policy and Procedures Manual, though it is unstated when such a change occurred.  Req. for Admission Nos. 5, 6, ECF No. 52-21.  The change in approach is further evidenced by the Investigative Report arising out of the January 2018 deployment of K-9 Berkley, which indicates that at some unspecified time, the CPD began employing a totality-of-the-circumstances type approach. ECF No. 52-24.  The analysis includes such factors as "the severity of the crime; [w]hether the suspect poses an immediate threat to the safety of the officer and others; and [w]hether

the suspect is actively resisting arrest or attempting to evade arrest at the time."   Id.

Plaintiff provides no evidence showing that CPD has not in fact abandoned the earlier, written policy in favor of the totality-of-the-circumstances approach referenced in the January 2018 Investigative Report, over a year prior to the May 2019 incident here, and in the City's discovery responses in this case.  Nor is any argument presented that CPD was not constitutionally permitted to make such a change.  Rather, the new policy much more closely tracks the requirements of the Fourth Amendment.  See e.g., County of Los Angeles v. Mendez, ---- U.S. ----, 137 S. Ct. 1539, 1542 (2017) ("The operative question in such cases is 'whether the totality of the circumstances justifie[s] a particular sort of search or seizure'").

Further, no evidence in the record causally connects the change in policy, nor the supposed non-compliance with the earlier written policy, to the deprivation of plaintiff's constitutional rights.  Accordingly, this practice cannot be shown to have caused plaintiff's constitutional injury and thus cannot form the basis for a Monell claim.  Thus, there is no basis for holding the City of Charleston liable under § 1983 and Count IV should be dismissed.

33

## D. Assault and/or Battery

Defendants argue that summary judgment should be granted as to Count V inasmuch as Gaylor's conduct was privileged under state law.  An activity that would otherwise subject a person to liability in tort for assault and battery does not constitute tortious conduct if the actor is privileged to engage in such conduct.  <u>Hutchinson v. W. Va. State Police</u>, 731 F. Supp. 2d 521, 547 (S.D. W. Va. 2010), <u>aff'd sub nom.</u> <u>Hutchinson v. Lemmon</u>, 436 F. App'x 210 (4th Cir. 2011).  A police officer is privileged under state law if he or she acts reasonably under Fourth Amendment standards.  <u>Id.</u>  Inasmuch as the reasonability of Gaylor's conduct is still an issue of disputed material fact, Count V cannot be dismissed as to Gaylor.[4]

Defendants also argue that the West Virginia Governmental Tort Claims and Insurance Reform Act ("WVGTCIRA") immunizes political subdivisions (like the City) from liability for intentional torts, such as assault and/or battery.  <u>See</u> W. VA. CODE § 29-12A-4(b)(1) and (c).  Plaintiff does not contest

---

[4] The court notes that while defendants have pled immunity and qualified immunity as general defenses in their answer, they do not raise an immunity defense in their summary judgment briefing as it relates to Count V.

34

this argument.  Accordingly, Count V is dismissed as to the City
of Charleston.

E. Intentional Infliction of Emotional Distress

        An IIED claim under West Virginia law requires a
showing:

> (1) that the defendant's conduct was atrocious,
> intolerable, and so extreme and outrageous as to
> exceed the bounds of decency; (2) that the defendant
> acted with the intent to inflict emotional distress,
> or acted recklessly when it was certain or
> substantially certain emotional distress would result
> from his conduct; (3) that the actions of the
> defendant caused the plaintiff to suffer emotional
> distress; and, (4) that the emotional distress
> suffered by the plaintiff was so severe that no
> reasonable person could be expected to endure it.

Syl. Pt. 3, Travis v. Alcon Labs., Inc., 504 S.E.2d 419, 421 (W.
Va. 1998).  "Whether conduct may reasonably be considered
outrageous is a legal question, and whether conduct is in fact
outrageous is a question for jury determination."  Id. at 428.

        As to the officers, defendants argue for summary
judgment inasmuch as they believe their conduct was reasonable
and lawful.  Plaintiff presents no evidence of conduct engaged
in by McClure or Vanhorn which could constitute conduct which is
atrocious, intolerable, and so extreme and outrageous as to
exceed the bounds of decency.  Their acquiescence to Gaylor's
use of K-9 Berkley does not meet the high bar under West
Virginia law.  Nor do the comments that defendants made

35

regarding the dog having sharp teeth or plaintiff's loss of bowel control, that plaintiff characterizes as taunts, rise to that level.  Courtney v. Courtney, 413 S.E.2d 418, 423 (W. Va. 1991) ("conduct that is merely annoying, harmful of one's rights or expectations, uncivil, mean-spirited, or negligent does not constitute outrageous conduct").

        Likewise, Gaylor's deployment of K-9 Berkley cannot reasonably be considered to be sufficiently outrageous to constitute intentional infliction of emotional distress.  While the objective reasonableness of deploying K-9 Berkley remains an issue of disputed fact, no reasonable jury could find that utilizing a canine to effect an arrest against a suspect who could be armed and dangerous, who disregarded more than a dozen warnings that a canine would be used, and who was in a location that posed substantial danger to the officer involved amounted to extreme and outrageous conduct exceeding the bounds of decency.

        Finally, defendant argues that the City is immunized under WVGTCIRA inasmuch as Count VI alleges an intentional tort. See W. VA. CODE § 29-12A-4(b)(1) and (c).  As with Count V, plaintiff does not contest this argument.  Accordingly, Count VI is dismissed as to the City of Charleston and as to each of the three individual officer defendants in this case.

36

IV. Conclusion

Accordingly, it is hereby ORDERED as follows:

1. Counts I, II, III, IV, and VI are dismissed as to all defendants;

2. Count V is dismissed as to defendant the City of Charleston;

3. Defendants' motion for summary judgment is denied as to Count V insofar as it pertains to defendant Anthony L. Gaynor.

Based on the foregoing, the City of Charleston, Troy Vanhorn, and Shaun McClure are dismissed from this action. The case shall proceed only as to Count V against Anthony L. Gaylor.

The Clerk is directed to forward copies of this memorandum opinion and order to all counsel of record and any unrepresented parties.

ENTER: August 2, 2021

John T. Copenhaver, Jr.
Senior United States District Judge